DECISION AND ORDER
 

 ADELMAN, District Judge.
 

 Plaintiff Lonnie Buchanan brings this civil rights action pursuant to 42 U.S.C. § 1983 alleging that defendant Kenneth Kopesky, a City of Kenosha police detective, violated his constitutional rights by failing to comply with lawful extradition procedures when he transported plaintiff from Waukegan, Illinois to Kenosha, Wisconsin in connection with a homicide investigation. Defendant Kopesky now moves for summary judgment.
 
 [1]
 

 I. FACTUAL BACKGROUND
 

 On November 16, 1998, four men entered a home in Kenosha, Wisconsin, and one of them shot and killed the homeowner. Two of the men were subsequently arrested and described the shooter as a black male with a disabled left arm who was known to them only as “Hard Times.” On February 25, 1999, defendant Kopesky, based on information provided to him, determined that plaintiff was the shooter and obtained a warrant for his arrest. On the same day, police in Waukegan, Illinois, acting on information from Kopesky, arrested plaintiff in Waukegan. Plaintiff did not have a disabled arm and was not known as “Hard Times.”
 

 Defendant and Kenosha Detective Les Meredith went to the Waukegan Police Station where plaintiff was held. Waukegan police advised plaintiff of the charges against him and read him his
 
 Miranda
 
 rights, which plaintiff waived. Defendant asked plaintiff to make a statement and plaintiff said he was innocent. Plaintiff states that defendant told him he could clear up the problem by coming back to Kenosha and making a statement. (Pl.’s Aff. ¶ 6.) Plaintiff further says defendant told him that after he gave his statement defendant would return plaintiff to the Waukegan Police Station, where plaintiff left his car.
 
 (Id.
 
 ¶ 7.) According to plaintiff, defendant then conferred with Waukegan and Lake County law enforcement authorities and appeared to be discussing plaintiffs “exhibition rights,” which plaintiff later discovered were his “extradition rights.”
 
 (Id.
 
 118.)
 

 Waukegan police officer Ward testifies that defendant and Meredith told him and Waukegan Police Lieutenant House, the officer in charge, that they wanted to take plaintiff straight to Kenosha from the Waukegan Police Station. (Ward Dep. at 28.) Ward says Lieutenant House told defendant and Meredith that removing plaintiff without following extradition procedures “wasn’t a good idea,” and that House would have to talk with the State’s Attorney’s Office “before anything like that happened.”
 
 (Id.
 
 at 30.) Ward states that the Kenosha detectives replied that removing plaintiff would not be a problem
 
 *1011
 
 as long as he signed a waiver, and that they do that kind of thing all the time.
 
 (Id.
 
 at 31.) Ward also says he did not see plaintiff sign a waiver of extradition but that he heard people in his office being told that such a waiver had been signed.
 
 (Id.)
 
 Ward indicates that he began preparing paperwork for the extradition, known as a “fugitive from justice ticket,” but that he, Lieutenant House and the other Wauk-egan officers learned that plaintiff was no longer in the building.
 
 (Id.
 
 at 33-34.) Ward states that neither he nor Lieutenant House gave the Kenosha officers permission to remove plaintiff from the Wauk-egan Police Station.
 
 (Id.
 
 at 35.)
 

 According to plaintiff, after the discussion between defendant and the Lake County authorities several of the Lake County authorities left his presence, at which time defendant shackled and handcuffed him and transported him to Kenosha. (Pl.’s Aff. ¶ 9.) Defendant states that he and Detective Meredith asked plaintiff in the presence of two Waukegan detectives whether he would accompany them to Kenosha and that plaintiff agreed. (Defi’s Aff. ¶ 9.) It is undisputed that prior to transporting plaintiff to Kenosha neither defendant nor any other officer advised plaintiff of his extradition rights.
 
 (See
 
 Pl.’s Aff. ¶ 16 (undisputed).) Plaintiff states that after defendant took him to Kenosha he asked plaintiff to sign a statement that he returned to Wisconsin voluntarily.
 
 (Id.
 
 ¶ 13.) Plaintiff states that he signed the statement but realized that defendant was not going to return him to Illinois as allegedly promised.
 
 (Id.
 
 ¶ 14.) The statement plaintiff signed makes no mention of extradition rights or of an agreement by plaintiff to waive such rights. (Def.’s Aff.Ex. D.)
 

 Plaintiff was held in the Kenosha jail for seventeen days, then was released without being charged.
 

 II. SUMMARY JUDGMENT STANDARD
 

 Summary judgment is required “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
 
 genuine
 
 issue as to any
 
 material
 
 fact and that the moving party is entitled to judgment as a matter of law.” Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; “the requirement is that there be no genuine issue of material fact.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis deleted). For a dispute to be genuine, the evidence must be such that a “reasonable jury could return a verdict for the nonmoving party.”
 
 Id.
 
 For the fact to be material, it must relate to a disputed matter that “might affect the outcome of the suit.”
 
 Id.
 

 Although summary judgment is a useful tool for isolating and terminating factually unsupported claims,
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), courts should act with caution in granting summary judgment,
 
 Anderson,
 
 477 U.S. at 255, 106 S.Ct. 2505. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied.
 
 Id.
 
 at 248, 106 S.Ct. 2505.
 

 The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law.
 
 Celotex,
 
 477 U.S. at 323, 106 S.Ct. 2548. Once this burden is met, the nonmoving party must “go beyond the pleadings” and designate specific facts to support each element of the cause of action, showing a genuine issue for trial.
 
 Id.
 
 at 322-23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings,
 
 Anderson,
 
 477 U.S. at 248, 106 S.Ct. 2505, or upon conclusory statements in affidavits,
 
 Palucki v. Sears, Roebuck & Co.,
 
 879 F.2d 1568, 1572 (7th Cir.1989). Both parties must produce documentary evidence to support their contentions.
 
 Whelstine v. Gates Rubber Co.,
 
 895 F.2d 388, 392 (7th Cir.1990).
 

 
 *1012
 
 In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party.
 
 Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is “not required to draw every conceivable inference from the record — only those inferences that are reasonable.”
 
 Bank Leumi Le-Israel, B.M. v. Lee,
 
 928 F.2d 232, 236 (7th Cir.1991). •
 

 III. DISCUSSION
 

 A. § 1983 Actions for Deprivation of Extradition Rights
 

 The law in the Seventh Circuit governing § 1983 claims based on deprivation of extradition rights was established in two decisions arising out of a single case,
 
 McBride v. Soos,
 
 594 F.2d 610 (7th Cir. 1979)
 
 (‘McBride I
 
 ”), and
 
 McBride v. Soos,
 
 679 F.2d 1223 (7th Cir.1982)
 
 (“McBride II”).
 
 There, the plaintiff was in custody in Missouri, but was wanted by the State of Indiana. After being transported to Indiana he brought a § 1983 action against the Indiana agents for allegedly removing him from Missouri without complying with extradition procedures.
 

 In
 
 McBride I
 
 the Seventh Circuit addressed the question of whether the defendant deprived the plaintiff of any rights, privileges or immunities secured by the Constitution and federal law as required by § 1983.
 
 See McBride I,
 
 594 F.2d at 611-12. The court held in the affirmative, stating:
 

 The obligation imposed on states to extradite fugitives from justice within its borders to the state from which he has fled upon proper demand from that state is rooted in the Constitution. Art. 4, § 2, cl. 2. This constitutional provision is implemented by federal statute, 18 U.S.C. § 3182. Before an individual can be extradited, the governor of the asylum state must determine: (1) whether the person demanded is substantially charged with a crime; and (2) whether the person demanded is a fugitive from justice from the state making the demand.
 

 McBride I,
 
 594 F.2d at 612 (footnotes omitted). The court went on to point out that:
 

 These safeguards serve to protect the rights of the alleged fugitive. As this court has stated:
 

 The statute is one involving the substantial rights of citizens, and its essential elements must be strictly followed ... Only by faithfully following the provisions of the statute may a person be lawfully deprived of his liberty and extradited from an asylum state to another state, there to be tried for the commission of a crime. The alleged fugitive has a right not to be imprisoned or dealt with by the states in disregard of those safeguards provided by the Constitution and statutes of the United States.
 

 United States v. Meyering,
 
 [75 F.2d 716,] 717 [ (7th Cir.1935) ] ([citations omitted). Failure to comply with procedural safeguards prior to extradition can be challenged in a
 
 habeas corpus
 
 proceeding.
 

 In addition to procedural protections embodied in the Constitution and the federal statute, the laws of Missouri and Indiana also provide safeguards for alleged fugitives. Under Indiana law, Soos and Haney, as agents of the demanding state, were required to follow certain procedures in obtaining a warrant from the Indiana governor. Finally, under Missouri law, plaintiff had the right to demand legal counsel and challenge the legality of the arrest by applying for a writ of
 
 habeas corpus.
 

 .... Under these circumstances where plaintiff has alleged violation of rights protected by federal law, and violation of rights protected by state law derived from federal law, we hold that a complaint which charges abuse of the extradiction [sic] power by noncompli-
 
 *1013
 
 anee with applicable law states a cause of action under 42 U.S.C. § 1983.
 

 McBride I,
 
 594 F.2d at 612-13 (first alteration in original) (footnotes omitted).
 
 [2]
 
 The court also rejected the contention that a § 1983 action for deprivation of extradition rights could only be brought against officials of the asylum state.
 
 McBride I,
 
 594 F.2d at 613 n. 9.
 

 After making this ruling, the Seventh Circuit remanded the case to the district court for further proceedings. The district court conducted a bench trial and entered judgment for defendants. The plaintiff appealed and the defendants cross-appealed challenging the district court’s ruling that the defendants had a duty to ensure that plaintiff received a pre-extradition hearing, and thus were personally involved in depriving plaintiff of his extradition rights. The Seventh Circuit generally affirmed the decision of the district court but on this latter point ruled:
 

 Section 548.101 requires the Missouri authorities to hold a judicial hearing before delivering the fugitive to the demanding state, but imposes no duty on the demanding state agents to ensure that this pre-extradition hearing is held. It is unreasonable to require the demanding state agents to be familiar with the procedural safeguards enacted in the asylum state’s extradition statutes and then further require them to ensure that the statutory safeguards have been followed. Defendants neither caused nor participated in the failure to hold a § 548.101 pre-extradition hearing. Therefore they cannot be held liable for this deprivation.
 

 ... Soos and Haney had no duty to determine that the Missouri authorities followed Missouri extradition law. Soos and Haney did all that they were statutorily required to do before accepting custody of McBride from the Missouri authorities and returning him to Indiana. Soos and Haney neither caused nor participated in McBride’s deprivation, and, therefore, McBride has no cause of action against them.
 

 McBride II,
 
 679 F.2d at 1227 (footnote omitted).
 

 Taken together, the two
 
 McBride
 
 decisions stand for the proposition that a plaintiff may prevail in a § 1983 action based on the deprivation of extradition rights against an agent of a demanding state only if the agent caused or participated in the deprivation of plaintiffs rights. Agents of a demanding state are not required to ensure that proper procedures in the asylum state are followed. If such procedures are not followed, agents of a demanding state will not be liable
 
 *1014
 
 unless they actively caused or participated in the failure to follow proper procedures.
 

 B. Protections Attaching to Informal Waivers of Extradition
 

 Under the Uniform Extradition Act, a fugitive may waive extradition either formally or informally. The Act, as passed in Illinois, provides:
 

 Written waiver of extradition proceedings. Any person arrested in this State charged with having committed any crime in another state or alleged to have escaped from confinement, or broken the terms of his bail, probation or parole may waive the issuance and service of the warrant provided for in [725 Ill. Comp.Stat.
 
 226/7
 
 and 725 Ill.Comp.Stat. 225/8] and all other procedure incidental to extradition proceedings, by executing or subscribing in the presence of a judge of the circuit court a writing which states that he consents to return to the demanding state; provided, however, that before such waiver shall be executed or subscribed by such person it shall be the duty of such judge to inform such person of his rights to the issuance and service of a warrant of extradition and to obtain a relief by habeas corpus as provided for in [725 Ill. Comp.Stat. 225/10].
 

 If and when such consent has been duly executed it shall forthwith be forwarded to the office of the Governor of this State and filed therein. The judge shall direct the officer having such person in custody to deliver forthwith such person to the duly accredited agent or agents of the demanding state, and shall deliver or cause to be delivered to such agent or agents a copy of such consent;
 
 provided, however, that nothing in this Section shall be deemed to limit the rights of the accused person to return voluntarily and without formality to the demanding state, nor shall this waiver procedure be deemed to be an exclusive procedure or to limit the powers, rights or duties of the officers of the demanding state or of this State.
 

 725 Ill.Comp.Stat. 225/26 (West 1998) (emphasis added).
 
 [3]
 

 Defendant argues that plaintiffs rights were not violated because, pursuant to the informal procedure, plaintiff agreed to return to Kenosha voluntarily. The question raised by this argument is what, if any, protections attach to the informal waiver procedure and whether those conditions were met here. Because plaintiffs right to bring a § 1983 action is based on an alleged violation of federal law this question is governed by federal law.
 
 Morrison v. Stepanski,
 
 839 F.Supp. 1130, 1138 (M.D.Pa.1993).
 

 The Supreme Court has not directly ruled on the question. The courts that have addressed it, however, have required that an informal waiver of extradition rights must at least be knowing and voluntary.
 
 Id.
 
 Perhaps the fullest discussion of the issue can be found in the decision of the district court on remand from
 
 McBride I
 
 in
 
 McBride v. Soos,
 
 512 F.Supp. 1207, 1215 (N.D.Ind.1981)
 
 (‘McBride III”)
 
 (alteration in original) (parallel citations omitted),
 
 [4]
 
 where the district court wrote:
 

 Although the Supreme Court has not defined waiver in the context of an extradition proceeding, the term has been defined for a broad variety of other constitutional rights. The generally applicable definition of waiver is “an intentional relinquishment or abandonment of a known right or privilege.”
 
 Johnson v. Zerbst,
 
 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The Supreme Court has repeatedly affirmed the principle that there is no presumption of acquiescence in the loss of fundamental
 
 *1015
 
 constitutional rights.
 
 See Fuentes v. Shevin,
 
 407 U.S. 67, 94 n. 31, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Indeed, every reasonable presumption should be indulged against finding a waiver of constitutional rights.
 
 Id.
 
 Addressing the Sixth Amendment right to counsel, the Court stated:
 

 Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.
 

 Carnley v. Cochran,
 
 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962). This same standard is applied in determining whether a guilty plea is voluntarily made.
 
 Boykin v. Alabama,
 
 395 U.S. 238, 242-43, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). In
 
 Fare v. Michael C.,
 
 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), the Supreme Court examined waiver of
 
 Miranda
 
 rights where the interrogation of juveniles was involved. It stated:
 

 Thus, the determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.
 
 Miranda v. Arizona,
 
 384 U.S. [436,] at 475-77, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 Fare, supra,
 
 442 U.S. at 724-25, 99 S.Ct. 2560.
 

 The court went on to apply the foregoing legal standard to the facts before it and found that the plaintiff had not validly waived the procedural protections afforded him by the extradition laws.
 
 McBride III,
 
 512 F.Supp. at 1212. The court pointed out that the plaintiff never voluntarily and knowingly relinquished such rights. The plaintiffs statement that he was prepared to return to Indiana and get matters straightened out did not “represent ‘an intentional relinquishment or abandonment’ of rights in an extradition proceeding” as required by
 
 Johnson. See id.
 

 A desire to return to Indiana and resolve the outstanding charges does not mean that McBride also waived his procedural protections. Although McBride was aware of some of those protections, he was not aware of all. More importantly, McBride was not fully aware of the nature of those protections. Absent such awareness, no waiver is valid. Defendants rely on the fact that “the plaintiff did not tell the defendants that he objected to being returned to Indiana.” Failure to object, however is not equivalent to an affirmative waiver.
 

 McBride III,
 
 512 F.Supp. at 1212-13.
 

 Thus, the
 
 McBride
 
 court identified three elements essential to a valid waiver: (1) an unequivocal statement by the accused of his intent to waive extradition rights, (2) made voluntarily, and (3) with some rudimentary understanding of the rights being relinquished.
 
 Id.
 
 Other courts which have addressed the issue of what is required for a valid waiver of extradition rights have reached the same conclusion as the
 
 McBride
 
 court.
 
 See Pierson v. Grant,
 
 527 F.2d 161, 164 (8th Cir.1975) (waiver of extradition rights voluntary as long as accused had a general knowledge and understanding of what was involved in the waiver when he signed it);
 
 Morrison,
 
 839 F.Supp. at 1139 (waiver of extradition rights must be “knowing” in the sense that the alleged fugitive understands that he has certain rights under the law and affirmatively indicates an intention to relinquish those rights and “voluntary” in the sense that it was given of the individual’s free choice);
 
 United States v. Pennsylvania State Police,
 
 548 F.Supp. 9, 15 (E.D.Pa.1982) (fugitive has right to waive rights in writing but only after they have been fully explained to him);
 
 People v. Isaacs,
 
 139 Misc.2d 323, 527 N.Y.S.2d
 
 *1016
 
 162, 164 (N.Y.Co.Ct.1988) (waiver of extradition rights must be intentional relinquishment of known right in order to be valid);
 
 Commonwealth v. Green,
 
 525 Pa. 424, 581 A.2d 544, 556 (1990) (waiver of extradition rights must be knowing, intelligent and voluntary).
 

 Another aspect of the law of voluntariness may have relevance in the present case. Plaintiff alleges that defendant deceived him into returning to Kenosha by promising to take him back to Waukegan immediately after making his statement. I am unaware of any case involving deception in procuring a waiver of extradition rights, however the issue has arisen in the context of an officer seeking to obtain a statement from a defendant.
 
 United States v. Serlin,
 
 707 F.2d 953, 956 (7th Cir.1983);
 
 see also United States v. Knowles,
 
 2 F.Supp.2d 1135 (E.D.Wis.1998). The rule in the latter context is that a defendant’s waiver of the right to remain silent will be held invalid only if the defendant produces clear and convincing evidence that the agents affirmatively misled him and that the misinformation was material to his decision to speak with them.
 
 Serlin,
 
 707 F.2d at 956.
 

 C. Application of Foregoing Legal Principles to Facts
 

 In order to decide defendant’s motion for summary judgment I apply the foregoing legal principles to the evidence in the record and ask two interrelated questions: (1) whether a reasonable jury could conclude that plaintiffs return to Kenosha was not, under the law, voluntary; and (2) whether a reasonable jury could conclude that defendant caused or participated in depriving plaintiff of his extradition rights. I conclude that a reasonable jury could answer “yes” to both questions.
 

 There is evidence in the record that prior to returning plaintiff to Kenosha neither defendant nor anyone else advised plaintiff of his rights relating to extradition, and that plaintiff lacked even a rudimentary understanding of the rights he was relinquishing by accompanying defendant to Kenosha. There is evidence that the extent of plaintiff’s understanding of extradition rights is that he thought that they were “exhibition rights.” Further, the evidence indicates that the written statement of “voluntariness” on which defendant relies was signed by plaintiff after, not before, he was transported to Kenosha, and includes no mention of the rights plaintiff was supposedly waiving. If the jury believed plaintiffs claim that defendant induced him to return by deception it might reasonably regard this as additional evidence of involuntariness. If the jury disbelieved plaintiff on this point, however, it could still find that plaintiff’s return was not voluntary because not knowing or intelligent.
 

 A reasonable jury could also conclude that defendant caused or participated in the deprivation of plaintiff’s extradition rights. The record discloses that when defendant told Waukegan police that he wanted to take plaintiff to Kenosha immediately the lieutenant in charge told defendant that it “wasn’t a good idea,” implicitly suggesting that it might be unlawful. There also is evidence that defendant knew that Waukegan police were going to call the Illinois State’s Attorney to determine what procedures should be followed but that he did not want to wait for a legal opinion and, instead, took plaintiff to Ke-nosha without the knowledge or permission of local authorities. Viewed in the light most favorable to plaintiff the evidence suggests that defendant essentially hijacked plaintiff out of the ■ custody of asylum state officials who were attempting to follow appropriate extradition procedures. Viewing the evidence in this light, a reasonable jury could conclude that defendant actively interfered with efforts to protect plaintiff’s rights and thus caused and participated in the deprivation of such rights.
 

 
 *1017
 
 D. Qualified Immunity
 

 Defendant argues that he is entitled to qualified immunity from civil damages under
 
 Harlow v. Fitzgerald,
 
 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Under the doctrine of qualified immunity “governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.”
 
 Id.
 
 at 818, 102 S.Ct. 2727. Courts thus employ an objective test for determining whether public official defendants are entitled to qualified immunity.
 
 See id.; Triad Assocs., Inc. v. Robinson,
 
 10 F.3d 492, 496 (7th Cir.1993). Once a defendant has pleaded a defense of qualified immunity courts employ a two step analysis: (1) does the alleged conduct set out a constitutional violation, and (2) were the constitutional standards clearly established at the time?
 
 See Siegert v. Gilley,
 
 500 U.S. 226, 231-32, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). In the present case I have already determined that the alleged conduct constitutes a constitutional violation. Thus, the issue is whether the constitutional rights in question were clearly established at the time of the alleged violation.
 

 The plaintiff bears the burden of establishing the existence of a clearly established constitutional right.
 
 Rakovich v. Wade,
 
 850 F.2d 1180, 1209 (7th Cir. 1988). The burden is a heavy one and appropriately so because qualified immunity is designed to shield from civil liability “ ‘all but the plainly incompetent or those who knowingly violate the law.’ ”
 
 Hughes v. Meyer,
 
 880 F.2d 967, 971 (7th Cir.1989) (quoting
 
 Malley v. Briggs,
 
 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). In
 
 Anderson v. Creighton,
 
 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court explained that “the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right” at the time of the incident. In determining whether the contours of a right are sufficiently clear I look first to case law on point or in closely analogous areas to see if “reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly.”
 
 Lojuk v. Johnson,
 
 770 F.2d 619, 628 (7th Cir.1985). In determining whether a right is clearly established in the absence of a guiding Supreme Court opinion, the Seventh Circuit, generally speaking, encourages trial courts to look at cases from all levels of the federal courts and from a variety of jurisdictions.
 
 See Burgess v. Lowery,
 
 201 F.3d 942, 944-45 (7th Cir. 2000) (“the absence of a decision by the Supreme Court or this court cannot be conclusive on the issue whether a right is clearly established in this circuit;” decisions of the Supreme Court of Hawaii may even be considered).
 

 Applying the foregoing principles to the present case I conclude that the constitutional rights allegedly violated by defendant were clearly established at the time of the alleged violation in February 1998. The two Seventh Circuit decisions in
 
 McBride
 
 clearly established that an accused had a constitutional right to have governmental officials comply with extradition procedures, and that agents of a demanding state could be held liable for depriving an accused of extradition rights if they caused or participated in the deprivation.
 

 It was also clearly established in February 1998 that certain constitutional safeguards attach to the waiver of extradition rights, as they do to the waiver of other constitutional rights, and that a reasonably diligent official would have been aware of the existence of such safeguards. The decision of the district court in
 
 McBride III,
 
 512 F.Supp. 1207, established that an accused’s waiver of extradition rights is not valid unless the defendant is first provided with a rudimentary explana-
 
 *1018
 
 tíon of such rights and unequivocally agrees to relinquish them. At least three other federal courts, including the Eighth Circuit, as well as the Supreme Court of Pennsylvania have also held that a waiver of extradition rights must be knowing and voluntary.
 
 See Pierson,
 
 527 F.2d at 164,
 
 Morrison,
 
 839 F.Supp. at 1142;
 
 Pennsylvania State Police,
 
 548 F.Supp. at 9;
 
 Green,
 
 581 A.2d at 556. Further, it has long been established that the waiver of rights protected by the Constitution must generally be knowing, intelligent and voluntary.
 
 See Johnson,
 
 304 U.S. at 464, 58 S.Ct. 1019. A reasonable individual in defendant’s position would have known that more was required to waive extradition rights than an after-the-fact statement signed by an accused who appears not to have had the slightest idea what his extradition rights were. It is also not irrelevant to the question of what a reasonably diligent official would have known that law enforcement authorities from the asylum state appeared to regard defendant’s proposal to remove plaintiff as unlawful. In sum, if defendant committed the acts alleged, he is not entitled to qualified immunity.
 

 VI. CONCLUSION
 

 For the foregoing reasons I will deny defendant’s motion for summary judgment. Taking all facts in the most favorable light to plaintiff, a reasonable jury could conclude that defendant deprived plaintiff of his extradition rights and is liable for such deprivation under § 1983. I note, however, that at trial plaintiff must show actual injury before recovering compensatory damages.
 
 Carey v. Piphus,
 
 435 U.S. 247, 260, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (§ 1983 plaintiff may recover compensatory damages for the denial of procedural due process only if but for the deprivation of rights the outcome would have been different);
 
 see also McBride III,
 
 512 F.Supp. at 1214 (if no actual injuries from defendant’s conduct plaintiff is entitled only to nominal damages).
 

 THEREFORE, IT IS HEREBY ORDERED that defendant Kenneth Kopek-sy’s motion for summary judgment is DENIED.
 

 FURTHER, IT IS ORDERED, that all claims against defendant City of Kenosha are DISMISSED.
 

 [2]
 

 . In addition to the Seventh Circuit most of the other circuits that have addressed the issue have held that failure to comply with extradition procedures before a transfer across state lines creates a cause of action under § 1983.
 
 See Draper v. Coombs,
 
 792 F.2d 915, 919-20 (9th Cir.1986) (claim alleging violation of federal extradition statute by demanding state and asylum state officers states a cause of action under § 1983);
 
 Ross v. Meagan,
 
 638 F.2d 646, 649-50 (3d Cir. 1981) (proof of arrestees claim tha1 police detective and governor of asylum state knowingly violated provisions of Uniform Criminal Extradition Act would entitle them to relief under § 1983);
 
 Crumley v. Snead,
 
 620 F.2d 481, 483-84 (5th Cir. 1980) (summaty judgment inappropriate where evidence indicated that the sheriff was acting under color of state law when he delivered plaintiff to Tennessee authorities without awaiting the outcome of the habeas corpus proceeding challenging extradition);
 
 Brown v. Nutsch,
 
 619 F.2d 758, 764 (8th Cir. 1980) (§ 1983 provides remedy for improper extradition by demanding state officers in violation of the Extradition Clause and statute);
 
 Wirth v. Surles,
 
 562 F.2d 319, 323 (4th Cir. 1977) (complaint alleging demanding state officer's arrest and transportation of fugitive without extradition proceedings created a cause of action under § 1983);
 
 Sanders v. Conine,
 
 506 F.2d 530, 532 (10th Cir. 1974) (complaint charging asylum state police officers and sheriff with noncompliance with extradition procedures stated a claim under § 1983);
 
 but see Barton v. Norrod,
 
 106 F.3d 1289, 1293-94 (6th Cir. 1997) (collecting above cases and holding that refusal to comply with extradition procedures did not state a claim under § 1983).
 

 [3]
 

 . This provision is identical to the Missouri statute that was considered in the
 
 McBride
 
 cases and to the statute presently in effect in Wisconsin.
 
 See
 
 Wis.Stat. § 976.03.
 

 [4]
 

 . The Seventh Circuit on the second appeal did not reach that portion of the district court's decision which addressed the standards governing the voluntariness of a waiver.